Michael J. EARLY, Plaintiff-Appellee,

v.

TEXACO REFINING AND MARKET-
ING INC., a Delaware Corpora-
tion, Defendant-Appellant.

No. 90-35635.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 1991.

Decided Dec. 13, 1991.

Mark Litvack, White Plains, N.Y., for
defendant-appellant.

Karen Tashima, Shannon, Johnson &
Bailey, Portland, Or., for plaintiff-appellee.

Before GOODWIN, SCHROEDER and
NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Michael J. Early (Early) brought suit
against Texaco Refining and Marketing
Inc. (Texaco) for revocation of his franchise
as a Texaco dealer in violation of the Petro-
leum Marketing Practices Act, 15 U.S.C.
§ 2801, et seq. Judgment was for Early,
and Texaco appealed. We reverse and re-
mand for entry of judgment in favor of
Texaco.

PROCEEDINGS

Early was an independent dealer at a
Texaco service station located at the inter-
section of Highway 66 and Interstate 5 in
Ashland, Oregon. He began work in this
capacity in 1980 and in 1989 was at work
by reason of an agreement with Texaco
that began September 1, 1986 and ended
August 31, 1989. On April 21, 1989 Texaco
mailed him notice that the franchise would
not be renewed because of numerous bona
fide customer complaints about Early's sta-
tion between August 1987 and February
1989.

On October 3, 1989 Early brought suit
under the Petroleum Marketing Practices
Act contending that his franchise had been
denied renewal in violation of the Act, 15
U.S.C. § 2802(a), and seeking an injunction
and damages as a result of this violation.
A trial was held before United States Mag-
istrate Michael R. Hogan, who made find-

ings of fact and conclusions of law and entered judgment granting Early a permanent injunction against Texaco, damages of $10,000, attorneys fees of $43,887, and costs of $1,592.

Texaco appeals.

## ANALYSIS

The statute provides that no franchisor engaged in the sale of motor fuel may fail to renew any franchise relationship except under certain circumstances. 15 U.S.C. § 2802(a). The statute goes on to provide that "grounds for non-renewal of a franchise relationship" include the following:

> The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if—
>
> > (i) the franchisee was promptly apprised of the existence and nature of such complaints following receipt of such complaints by the franchisor; and (ii) if such complaints related to the condition of such premises or to the conduct of any employee of such franchisee, the franchisee did not promptly take action to cure or correct the basis of such complaints.

15 U.S.C. § 2802(b)(3)(B).

Texaco cited twelve customer complaints as the basis for its action. Magistrate Hogan held that the Tonkin complaint was not sincere, and that Early was not promptly apprised of the Bonney complaint. As to the remaining ten complaints the court in its conclusions of law held that the complaints were not "bona fide." In support of this conclusion the court relied upon *Robertson v. Mobil Oil Corp.*, 778 F.2d 1005 (3rd Cir.1985), the only decision by a federal court of appeals interpreting the statute in question. In it the Third Circuit held that to qualify as "bona fide," ... a customer's complaint must be "sincere," and the circumstance complained of must, "in fact, exist" and be one for which the franchisee "can reasonably be held accountable." *Id.* at 1008.

The district court in effect interpreted *Robertson* as imposing a burden upon the franchisor to prove that the circumstances complained of did in fact exist and that the franchisee was in fact culpable. The district court ruled that Texaco had not shown that the circumstances of the Addington, Farrell, and Stremple complaints had a reasonable basis in fact and that as to the Grafeld, Kent, Martinello, and Van Velkinburgh complaints, Early could not reasonably be held accountable because "he promptly took responsible steps to resolve those portions of the problems which could reasonably be attributed to his conduct or that of any of his employees." As to the Stremple and Zulke complaints the court ruled simply that Early could not "reasonably be held accountable." The court concluded that only the Hall and Wiseman complaints met the bona fide standard set by the statute. As a consequence, the court concluded that Texaco had not received "numerous bona fide customer complaints" between August 1987 and February 1989, and so judgment must be for Early.

*Robertson,* however, did not require the franchisor to prove the validity of the complaint or the actual culpability of the franchisee in order to establish that a complaint was "bona fide" within the meaning of the statute. The problem which the Third Circuit addressed was that the common legal definition of "bona fide" might include complaints that were sincere, but utterly baseless or implausible. *Robertson* modified the definition of "bona fide" to require not only that the complaint be "sincere" but that it also have a "reasonable basis in fact." *Robertson,* 778 F.2d at 1008, spelled out what it meant by this requirement by quoting with approval the language of the district court in the case before it stating that none of the complaints received by Mobil was on its face "the expression of somebody who's responding in a wholly bizarre way to the external world." *Id.* That depth of inquiry in interpreting what is sincere and has a reasonable basis in fact is obviously what the statute requires.

■ Under the standard articulated in *Robertson,* with which we do not disagree,

ten of the twelve complaints were sincere and had a reasonable basis in fact:

Noel Addington and his wife complained to Texaco that they stopped at Early's station to have tire chains, which they already owned, put on their car. Mrs. Early told them the chains were too short and sold them a far more expensive pair. When they reached home in Portland, Oregon, the dealer who had sold them the original chains proved they were the proper size. Noel Addington wrote Texaco, apropos of Early and his wife, "I thought they were thieves because they sold me a set of chains I did not need."

Shirley Farrell complained to Texaco that her overheated car had been towed to the station where it remained from 2:30 p.m. to 8:30 p.m., at which time Early said it had been fixed. The next morning the car was leaking fluid again and she had to pull into another station for further repairs. When she stopped at Early's station on the way back to express her dissatisfaction with his work the attendants were not responsive.

C.J. Van Velkinburgh took his vehicle, a 1973 Plymouth body on a 1975 Dodge chassis with over 408,000 miles on it, into Early's station for transmission work. The job took twice as long and cost three times as much as Early had estimated. The next day, after the car was supposedly fixed, it broke down and needed to be repaired again. On Van Velkinburgh's complaint to Texaco, the company cancelled the charge.

William Grafeld complained to Texaco that the attendant forgot to remove the fuel nozzle from his tank when he asked him to move his 1987 Mercedes Benz forward so that an attendant could wash off diesel fuel that had sprayed onto the car. The result was that when Grafeld moved the car the nozzle caused two dents in the new Mercedes. Grafeld complained to Early who told him that he, Early, did not have to pay Grafeld anything but that he would give him half the cost of the damage. Grafeld testified, "I didn't feel that I was responsible at all, really, for the damage to the car. And the equipment was, you know, wasn't really—let's say shot. And if they had a hose that didn't leak, nothing would have happened."

William Hall reported to Texaco that the attendant was rude and belligerent, threw a greasy rag at him and used some words that Hall found upsetting. He testified, "This was something—the type of thing that Texaco allowed to go on, then I was not really happy with that type of company to do business with."

Harry S. Martinello and his wife had their overheated 1976 Dodge Ram, which had been pulling a 23 foot trailer, towed to Early's station to have the twelve-year-old radiator repaired. They complained to Texaco that the repair work was neither started nor finished when promised, that Early's wife did repair work which she admitted she was not qualified to do, that the repair work was done improperly, that they were overcharged, and that Early had little sympathy for their concerns. The Martinellos wrote Texaco "simply to state that we were dissatisfied and that's what we wanted it known, that we were not happy with the service we received."

Donald Kent and his wife had their overheated ten-year-old American-made car towed to Early's station, and Early agreed to look for a replacement engine. This process took seven weeks, during which the car remained at the station. The Kents' children wrote to Texaco complaining about Early's refusal to return their phone calls, his failure to keep them informed of any unforeseen delays, and his lack of initiative in getting a replacement.

Stephanie Stremple sought help from the station with her tire chains. Early told her the car was dangerous to drive and offered to fix it. She decided to call her husband for help. According to Mrs. Stremple, Early was disgusted by this idea. She had the sense that he was trying to make a sale. She did call her husband who came and drove the car to Roseburg, Oregon to their regular mechanic, who stated the car was fine mechanically, although the chains had caused a lot of body damage. Mr. Stremple called Texaco to complain about his wife's feeling that Early was hustling her,

trying to take advantage of her because she was alone.

Mr. Wiseman stopped at the station for a repair to the leaking radiator of his 1978 Matador. Early soldered the radiator and charged Wiseman $97.00. The same leak reappeared 100 miles later and Wiseman had to have another station repair the leak. Early told Wiseman that he would send him a refund check but never sent one. Wiseman wrote Texaco complaining of this failure and Texaco gave him a credit for this amount on his charge account.

Doug Zulke pulled into the station for gas and to use the sani-dump. After the use of the sani-dump, attendants charged him $5.00 for the use, although there was no indication that any charge would be made. After complaining without avail to the station attendant, Zulke wrote to complain to Texaco about the charge.

A review of these complaints confirms the finding of the district court that they were made sincerely. Not every discourtesy and not every failure of service will rouse a customer to the point of taking the time and trouble to write a letter to a company. That ten persons were sufficiently irritated by their treatment by Early in a period of eighteen months is convergent evidence of his shortcomings as a service station operator. The court made the just observation that none of the complainants was a resident of Ashland and that a number of them were in stressful situations, either because their chains had failed them in winter or because their cars had overheated crossing the pass into Ashland. These unfortunate circumstances, however, can be interpreted two ways— either that these customers were more susceptible to irritation than the average customer or that Early failed conspicuously to help strangers in some distress or at least gave them the impression that he was more interested in his own advantage than in helping them. On either reading, the circumstances did not dilute the sincerity of the complaints.

The Petroleum Marketing Practices Act reflects a balance between the desire to protect franchisees from arbitrary termi-nations by franchisors with superior economic power and a desire to give franchisors the right to protect their reputation when their franchisees are sloppy in their service. In this case, the court went beyond the simple "basis in fact" requirment set forth in *Robertson*. The court imposed on the franchisor the burden of conducting some kind of mini-trial to determine the truth of each complaint. The *Robertson* requirement that the complaint be one for which the franchisee could "reasonably be held accountable" is, abstractly put, a reasonable requirement. It is the equivalent of the statutory protection accorded franchisees who "promptly" take action to "cure or correct" the basis of the complaint. The problem is that the standard was improperly applied by the court in the cases of Kent, Grafeld, Martinello, and Van Velkinburgh. In Van Velkinburgh's case it was Texaco that cancelled the charge, not Early. In the case of the Martinellos, only $95.00 of the $280 bill was refunded. In the Kents' case, their complaint about not being kept informed was not satisfied. In Grafeld's case, Early paid only half of what Grafeld thought he should. In none of these cases did Early cure or correct the basis of the complaint, and in each of these cases Early could reasonably be held accountable for the harm.

The court also ruled, as a matter of law, that Early acted reasonably towards Stremple and Zulke. There is, however, no doubt that actions of Early generated the complaints of Stremple and Zulke. A subjective evaluation of the service received entered into their complaints. Such subjective evaluation is usual when a customer decides whether or not he or she has grounds for dissatisfaction warranting complaint. As Early's conduct caused the subjective dissatisfaction, there was no reason for the court to hold that Early should not be accountable for the customer's reaction. In a situation where nothing that was done by Early or his employees led to a complaint, the court's holding would make sense. In the situations presented by the cases before us, it could not be ruled as a matter of law that Early was not responsible for any of the sincere complaints that Texaco received.

■ In determining whether the ten sincere complaints received in the period of eighteen months meet the standard set by the statute of "numerous" complaints we are influenced by practice in the industry. In *Robertson* Mobil had received 126 complaints in a three-year period, or over forty per year. 778 F.2d at 1006. In a case in the district court in Oregon, eighteen complaints within a two-and-a-half-year period was held to be numerous. *Blankenship v. Atlantic Richfield Co.*, 478 F.Supp. 1016, 1019 (D.Or.1979). That was a rate of complaint of less than one a month. In the present case Texaco offered testimony that the average complaint about a Texaco station in the marketing region involved was less than one complaint per year. By this standard and by that followed by the district court in *Blankenship*, the ten sincere complaints were "numerous." Texaco as a franchisor had the right under the statute to protect its reputation and to maintain its policy that the customer is always right. It had statutory grounds to terminate the franchise.

REVERSED and REMANDED for entry of judgment in accordance with this opinion.